Apprentice, please step forward and introduce yourselves and approximate how much time you need for your argument. Good morning, Your Honor. I'm Valerie Quinn, here on behalf of the Department of Human Services. Good morning, Your Honor. Miriam Hallbauer, Legal Assistance Foundation, on behalf of Langton Faculty. I'm prepared to speak for about 30 minutes. Okay. We won't hold you. That'll be fine. As long as you don't start repeating yourselves. You're the prevailing party. You need 30 minutes? All right. Thank you. May it please the Court. The Ethics Act forbids employers from reprimanding, discharging, suspending, demoting, denying promotions or transfers, or changing the terms and conditions of someone's employment as retaliation for protected activity. None of those things happened to Mr. Wynn, which is why the Circuit Court's judgment should be reversed. Mr. Wynn's case was predicated on the Circuit Court accepting his claim that he was discharged. He was not discharged. He was a contract worker whose employment ran in one-year increments from July 1st to June 30th every year. And every year, he knew he had no right to a renewal of his employment until a new contract was offered. The fixed-term contract he was working under expired of its own terms, and when it did, he knew the Department could not renew it because it would have violated the court-department agreement that it had with AFSCME. How many years had he been employed by the State? It was, I believe it was about 13 years altogether, Your Honor. And was he always a contract employee? He was not always a contract employee. In fact, in the spring and summer of 2009, the Court will remember from the testimony that the labor process was heating up and the Department was told it couldn't do personal service contracts. So for that year, to keep him working, they placed him at Catholic Charities and they routed the Healthy Start funds that would pay for his paycheck through Catholic Charities' payroll. The trouble is that Catholic Charities' entire vendor contract expired on June 30th of 2010, so that wasn't a place they could keep him any longer. And at that point, they had to seek permission to get him a successor contract that ran him through December of 2010. How many people were employed in the same position as Mr. Wynn? In community health and prevention, there were about 25 contract workers. They lost somewhere around 12, 15 of those people. But that, of course, was not the only place where there were contract workers. There were just hundreds of them. But there were two people that did not lose their jobs, two women, right? That is correct, Your Honor. How do you distinguish those two women from Mr. Wynn? What was the difference between them? The difference between them was that they were employees of Ounce of Prevention. They were probably classified as PSA 6, but the scope of their duties was not union work. They were Ounce of Prevention employees, and so they stayed at Ounce of Prevention. I don't know if Ounce of Prevention still has a vendor contract with the Department. I didn't look that up. So they had the same title as Mr. Wynn, but they were not doing the same work. Because it's two things, Your Honor. It's what's your title and what's your scope of duties. And if your duties are union work, you can't stay in that role without violating the collective bargaining agreement. So after Mr. Wynn was let go, nobody else continued to perform that job? I'm sorry, Your Honor. After Mr. Wynn was let go, did anybody else perform those functions? His job. His job. What happened was that they determined that they needed, they continued to need that function. So they posted and hired an asking worker, somebody who was already working for the state, who had worked on Healthy Start in the past, who had actually been a Healthy Start grant administrator early, early on when that program came to Chicago. And she was already a state employee, so she was hired for that role. If no one had, I'm sorry, go ahead. But they would not have needed to post if they had retained Mr. Wynn, correct? They could not retain him on a contract, Your Honor. He was invited to apply for that position. Absolutely he was. And, you know, he acknowledges the same. His immediate supervisor liked him so much, he said, you go ahead and apply for this. However, he asked for seniority rules when they had first, you were required to post the job internally. And if you don't get any bids from somebody who is already a union worker, then you can take applications from people who are not union workers. You get posted on the street, basically, is what it is. In this case, it happened they already found somebody internally who was qualified to take the job, and they had to hire her. That's, you know, the bargaining, that's the collective bargaining agreement. That's how it works. Was he qualified for the new position that they advertised for? I'm sure he would have been qualified for the position. The trouble was with the ask me seniority rules. When you have to, when you're required to post internally first and take bids from whoever has seniority under the collective bargaining agreement, if you get a qualified applicant, you have to stop there. If nobody had been in the position, then they could have posted it, and taken applications from people who were not internal to the state already. Your Honor's failure to renew a fixed-term contract is not a discharge within the meaning of the Ethics Act. To discharge somebody means to fire them. It means don't bother showing up, and we're not going to pay you anymore. And that is not what happened here. This Court has held the cause of action for discharge under the Ethics Act is analogous to the tort of retaliatory discharge, a narrow exception to the At-Will Employment Doctrine. When parties have a contract, the terms of that contract controls. But the retaliatory action is defined as change in terms or conditions of employment of any state employee. He was a state employee, and it was change in his terms or conditions of employment as a result of a retaliatory action. But, Your Honor, if change in terms of conditions is broad enough to swallow up discharge, it swallows up pretty much every other retaliatory action enumerated in the Act, and then discharge is surplus. The problem with the argument, though, is that they specifically say the word discharge, right? In the Act. Right. So it must mean something different than discharge. I'm sorry. Oh, change in terms of conditions has a well-known meaning in labor and employment law. It means pretty much everything they can do to you, perhaps even force you out of your job, short of discharge. It's, you know, demoting you. Well, demoting is actually in the Act. But it's, you know, they take away your benefits if you have any. They lower your pay. They take away your responsibilities and give you two paperclips to twaddle. They move your desk down by the washroom so you get driven crazy by the water going. You know, that's terms and conditions. Or in the case we cite in our reply brief, that husband and wife research lab, they got their lab equipment moved. So giving an employee two pieces of paper to contemplate all day long is compensable, but firing is not? They didn't, but that's just it, Your Honor. Or taking his employment away from him and telling him, don't ever show up again and we're not going to pay you anymore. That's not compensable? Well, if they'd done that in the middle of his contract, yes, he would have been fired, Your Honor. But as this Court has held, when you're on a fixed-term employment contract and your contract expires and it's not renewed, you do not have a case for discharge because you have not, in fact, been discharged. And that's the case even in instances where the person has done some whistleblowing during the pendency of their contract. That was the case in Crum and Bajo. And what's interesting, both of those plaintiffs continued to be paid through the expiration of their contracts, but they were not permitted to show up for work or continue performing work for either defendant. And yet this Court held that neither one of them was discharged, even though both were forbidden to show up for work. Mr. Linscomb, the discharge is even weaker than that because nothing changed for him. He continued, his supervisors continued to entrust him to carry out all of his responsibilities and he continued to serve as the point person, the liaison, for the program side of the audit that was going on. But isn't changing his employment conditions similar to what is in Title VII with regard to altering the terms of employment, which would encompass, under that analogy, would encompass his termination? The Ethics Act is its own thing. It's not similar to Title VII. We're not saying it's similar to Title VII. We're saying in order to interpret that language, we can look for guidance to Federal cases. One could look there, but it's not even ironclad in Title VII, Your Honor. It's the case that a change in the terms of your conditions can be compensable. A discharge can be a change in your terms of conditions if it's done for discriminatory reasons under Title VII. This is not that. In this case, the General Assembly was very, very clear and precise about what constitutes retaliation under the Ethics Act. And it's limited to those seven specific actions. The legislature knows how to craft a statute that sweeps broadly, if that's its intention. It did so in the Illinois Discipline Act because that doesn't even have a definition of retaliation. It talks about it in three different sections, but it doesn't define it. It could hardly get more expansive than that. And in the Human Rights Act, it specifies discharge and non-renewal of somebody's employment. And the Human Rights Act predates the Ethics Act by some number of years. The General Assembly did neither of those things. It did not sweep broadly. It was very precise. And there is no rule, Your Honor, as a statutory construction that authorizes a court to declare that the legislature did not mean what the plain language of the statute says. And as with any legislative enactment, there is line to write. You know, a statute will cover one thing, but not something else. The General Assembly chose to protect contract workers from being given the boot during the pendency of their contracts, but it did not guarantee them a lifetime of renewals. And if this court were to agree that non-renewal of an expired employment contract is not a discharge within the meaning of the Act, the court may not reach the balance of the issues in this case, which is the question whether the circuit court's findings were against the manifest weight of the evidence. Nevertheless, they were. The Act required Mr. Wynn to prove that his speaking to the auditor was a contributory factor in the retaliatory action. And assuming for the sake of argument that this Court agrees that non-renewal of such a contract is such an action under the Act, Mr. Wynn did not establish that his speaking to the auditor had anything to do with his non-renewal, whereas the Department introduced overwhelming evidence that Mr. Wynn, like the many other contractors performing union work who lost their jobs, could not stay in his role without violating the collective bargaining agreement. But here we have Mr. Blair. His testimony, the judge pretty much discounted to zero, saying that it was not credible. So what we have left is the fact that the other evidence showed that Mr. Blair was pretty upset with what Mr. Wynn did. And it just has to be a contributing factor. That's a much less harsh standard to be applied. Was that a contributing factor? And with regard to the evidence, several people testified to the anger that occurred from Mr. Blair and what happened immediately afterwards and for the next several months. Well, the evidence established that he was angry or perturbed around the time that the protected activity occurred. And this was an interesting thing, too, because it's not to denigrate what Mr. Wynn did, but the auditor's already had questions about this payment. It was not something that was not going to come to light when he blew the lid off it. The auditor had a question about it. He answered it. He reported it to his supervisors. They thanked him. They said, keep us surprised. And there is some indication that Mr. Blair was irritated because financial questions should have come to him first. Does that mean? Well, but then to make matters worse, Blair gives an explanation that's untrue. And then he recants that explanation because Mr. Wynn said, no, no, no, that's not right. It looks like the first one was off the top of his head. His second explanation actually was correct, Your Honor. The money did go to pay for technical things. The money went. This is not the only overpayment. Not overpayment. Unallowable expense is how the findings describe it. The money went to pay a valid debt owed by the state. The problem was the money should not have come out of that grant to do it. But that's got people riled up. I mean, people told him that, you know, you better be silent. And immediately they want his phone back, which he already had given. I mean, it shows a – it could be a contributing factor. That's what the judge felt. I mean, why should we upset what the judge felt? Well, let's assume it is a contributing factor. The evidence was overwhelming that Mr. Wynn could not stay in his role without violating the collective bargaining agreement because he held a bargaining unit title and he was doing bargaining unit work. And nobody disputes that. I think they do dispute that. I mean, in fact, they do dispute that, you know, his name was given. Mr. Blair's testimony wasn't believed as to what was going on with regard to the Fletcher process. So where is this overwhelming evidence? Where is it? There is undisputed evidence that Mr. Wynn was classified as early as 2008. Right. That's not a fact. I mean, the classification, there was information that was given. Look at that on the side. Right. That really is not a fact. His duties, which were part of his classification, he's classified and he has duties. So were the two women. They were classified the same. But their job duties were not bargaining unit job duties. His work. Well, that's not what the judge felt. I'm sorry. The judge found that his job was not terminated. A contributing factor to his termination was his disclosure to the auditor of the $100,000 payment to the Springfield entity. Right. But, where did I want to go with that? Sorry, I lost my thought. That's all right. Don't worry. That happens. That happens all the time. Yeah, it did. It is, he was performing bargaining unit work, Your Honor. And the other two women who he raises were not. So, if I understand you, and correct me if I'm wrong, and interrupt me if I lose my train of thought, your position is that he could have been the most obnoxious whistleblower in the history of the department, alerted the auditor to this misconduct, assuming it's misconduct. Right. But if he did, and the department had the authority at the termination of his term to discharge, to not renew his appointment, right? As they did with hundreds of other people. His contract expired. It couldn't renew it without violating the collective bargaining agreement. So, your position is, as far as Mr. Wynn is concerned, assume the worst as far as his relationship with whistleblowing and everything else hasn't affected the department. He was scheduled to be discharged in December. That's what they did. That's what they did. It doesn't matter. It doesn't matter. And his entire case rests on speculation, Your Honor. I think that's where I wanted to go. His position is, and I think the circuit courts was too. Well, Mr. Gray could have influenced the Fletcher process. So, therefore, he must have. And that's really not a lot to go on, particularly when you have all this evidence. I mean, hundreds and hundreds of people were losing their jobs. His argument is essentially that because he spoke to an auditor on one occasion, special extra efforts that nobody else got should have been made for him. No, I don't think that's his argument. It's not that. A contributing factor in his not being renewed was the fact that he had made a statement to an auditor, which got everybody kind of riled up. And as a result of that, various things occurred. And, you know, with regard to the key testimony here, which is a blasphemy testimony, we have to ignore that because it's not credible. But there were other credible witnesses who did fill in all the other pieces of this. And, Your Honor, the circuit court actually found that the Department should have, and they used this term, accommodated Mr. Wynn and made him an employee. And it really isn't clear how the Department was supposed to do that when apparently the Department should have renewed his contract in violation of the collective bargaining agreement or it should have found a way to flout the hiring rules to give him preference over union employees who were already employed by the standard. But that's not the standard. The standard is whether there was a contributing factor. Yes, that is the standard. So that's all we have to look at. What I'm speaking about now, though, Your Honor, is the circuit court's findings. And that's actually what the circuit court said. They should have accommodated him. They should have made him an employee. They couldn't. Well, we don't need to look at that language. The most important thing is with the judge finding there was a contributing factor. Does the court wish me to address, there's an outstanding motion that was taken with the case. Does the court wish us to address that at all? Go ahead. If the court has questions about it. Do you have something you want to say about it? Mr. Wynn filed a motion to deem a portion of the department's reply brief waived or to file a serve reply. And to cite the Finko case, which is a first district case. Now, it's interesting because Rule 341J has always been interpreted to mean that an appellate cannot raise a new argument or issue in its reply brief. The department's research has disclosed no other case holding that, responding to an appellee's argument, you're precluded from citing anything you didn't cite in your appellate's brief. And if the rule is now interpreted to mean that an appellant is restricted to citing only the case law and the authority that it cited in its opening brief, appellants are going to be severely prejudiced in their ability to respond to whatever arguments an appellee chooses to make. And the Finko case is kind of surprising because Mr. Finko was a per se. His briefs are not on Westlaw. But the city's is. The city is the appellee here. And the city cited the disputed authority in footnote three of its brief. So when Mr. Finko responded to it, somehow he got dinged for raising new authority. So we'll get to admit, Your Honor, that the Finko case is wrong on its own facts and really, really wrongly construes the rule, Your Honor. Okay. Thank you. Thank you very much. I assume you reserve. I reserve time for rebuttal. Thank you. Good morning again, Your Honor. Miriam Hallbauer with Legal Assistance Foundation on behalf of Mr. Winn. Your Honor, the trial court found that because Mr. Winn reported Fiscal Officer Dan Blair's inappropriate payment of almost $100,000 to an auditor and to supervisors, refuted his false explanation for the payment, the defendant failed to renew his contract. Mr. Winn didn't. Well, he wasn't taking a job of a union employee, and that's the reason, plus his classification. So many people were in that same category as far as classification and taking a job of a union employee. So he would have been discharged no matter what. Well, that was not what the evidence showed, and that's not what Judge Schneider found based on the evidence. The defendant is repeating a mantra that he was doing bargaining unit work, and therefore there's no way that he could have been renewed. It was the defendant's burden to prove by clearing convincing evidence that not only that Mr. Winn could have lost his job anyway, but that he would have lost his job anyway. And the defendant just failed to meet that high standard because they point to two things. They point to his classification as the reason why their hands were tied, and they really weren't. I mean, their own witness said that there were exceptions that could have applied. So first of all, Mr. Winn was a vendor. He worked for a vendor. And Jeffrey Koontz, the defendant's witness, testified that, oh, vendors are treated differently. They're not considered to have a classification. So this PSA 6 business wouldn't even have come into play, and we would have been able to argue on behalf of an employee of a vendor that a subcontract was appropriate under Article 29, and that just means showing that it's necessary or desirable because of greater efficiency, economy, or other related factors. So that's a pretty broad standard, and Koontz said there was a lot of discussion about the vendor employees because it is a broad standard. So that exception, when Koontz was asked whether that exception could have applied, he said, I don't know. That's a program question. And when he was asked, well, was Blair a program person, he said, yes, Blair was a program person. In other words, Blair was the person whose job it was to say, this is the exception that applies to Mr. Winn. We want to keep him. And we know that but for retaliatory motive, he would have done that because as we detail at length in our brief, Mr. Winn's supervisor and her supervisor really wanted to keep Mr. Winn. They considered him indispensable. They considered him not very easy to replace. His supervisor's supervisor even tried to seek intervention from the federal officer in charge of the Healthy Start grant. Please help us to figure out how to keep Mr. Winn. The exception is so valuable that one year they went to Catholic Charities in order to keep him. Exactly. Blair was able to move him from contracts to vendors and back again, as Judge Snyder found, as a way to accommodate because they tried to keep him. It wasn't that they were doing him any favors. They wanted to keep him and they would have kept him. And what Judge Snyder found was that they didn't treat him in a neutral manner, particularly Blair, when he's presenting the case to his labor negotiator, a non-retaliatory Blair would have said, keep this guy, everyone loves him. A retaliatory Blair would have said, and instead, if a liaison like Blair said, oh, we have no problem getting rid of this contractor, he wasn't going to say why. Is your argument that the case turns on Blair's testimony? Well, Blair's testimony and the fact that his story was found not credible by Judge Snyder is independent evidence that there was a discriminatory motive and that discrimination happened. So your position, as I understand you, is the Department had the discretion of whether to remove the contract in December. And but for the actions of Mr. Wynn, it would have been, an inference can't be drawn that he would, or that position would have been retained for the successive year. Absolutely. And that the evidence supported your position that it was a pretext to bring the union issue into it to justify the termination of Mr. Blair. That's your position. Not Mr. Wynn. I'm sorry, Mr. Wynn. Exactly. In other words. Judge Snyder found the testimony of Mr. Blair unbelievable, not credible, and therefore this but-for analysis exists, and that is enough to show it wasn't a cause. Right. I mean, Blair's testimony being unbelievable actually shows that he's hiding something. And when somebody is hiding something, when there's a suspicion of mendacity, as the U.S. Supreme Court put it, that's some indication, that's already evidence that something's going on that the defendant is trying to hide. But I want you to address this point. The State continues to maintain that the failure to renew a fixed-term contract is not retaliation. Tell me why the State is wrong. Okay. First of all, the Ethics Act defines an employee to include a contractual employee, and therefore the legislature intended to protect contract employees from retaliation. And you get that from how? The definition of employee in the Ethics Act. Includes the word? It says including employees. I can give you the exact language if you want it. Including employees working pursuant to contract. And if, as, and the defendant appears to concede that the Ethics Act covers contractual employees, although it doesn't address the argument in its reply brief. What the defendant just said was during, well, it just protects them during the pendency of the contract. That would absolutely gut the protection that the General Assembly intended for contractual employees because all an employer would have to do is wait for the contract to expire. And, in fact, it could adopt really short contracts and say, oh, no, it's, you don't have a right to contract renewal, so sorry, even though we're retaliating against you, it's perfectly legal. But the contract did expire, correct? Of course. The contract expired. But what the defendant did was say, we've been giving you, we have renewed your contract for 13 years as a matter of course. And if you look at the cases that the defendant cites in its reply, it says, you know, a term and condition of contract doesn't have to be in the contract. It can just be part of the general practice. Well, this was certainly part of the general practice. They just sent his contracts off. They came back in a process that the, his, Mr. Wynn's supervisor described as automatic. So it was a term and condition of his contract for that to be renewed, and the retaliation intervened and caused them not to renew it. But she said his position became a union position, and they had to give it to someone else. Is that right? That's what she said, but that's not what the evidence showed. The court found that the process was a lot more flexible than the defendant presented. And the reason we know, I mean, there's a lot of reasons why we know that. We know that for one reason because two employees in a very similar situation to Mr. Wynn were kept on. They had that PSA 6 classification. The defendant says, well, that was the end of the story. How could it be the end of the story if they kept these two employees? She said they had different duties. Well, what she said is they worked for a vendor, Ounce of Prevention, and that Ounce was somehow treated differently. Judge Snyder rejected that theory for good reason. If Ounce of Prevention was treated differently, why were there so many Ounce of Prevention employees who were even subject to the process? Their theory implies that this vendor for some reason was exempted. But it doesn't really line up with the evidence because there's lots of people who worked for Ounce of Prevention who went through the process as everyone else. Generally, what Judge Snyder found was this was a fluid process. They negotiated every person. If it was as easy as saying, well, he was classified PSA 6 so he couldn't make it past December of 2010, the process wouldn't have taken nearly as long as it did. Nobody testified that the labor negotiator, all he wanted to know was what's your classification? We can be done with this person. He wanted to know a lot of information. Why? Because there were exceptions that applied. It wasn't just the exception for vendor employees that I talked about before. There was also an exception for direct contract employees, which was a little bit narrower, but Ounce admitted that one could have applied too. So this was a very flexible process that went person by person. Ounce said, I can't say, I would have to look at the specifics of every single employee. I can't tell you whether one or the other would definitely have to go or be able to stay. It depended. It was negotiation. Was there any evidence as to the number of contract employees similar to Mr. Wynn, those positions? Were there a thousand of them or were there just two? It depends on what lens you look at. Mr. Wynn's Exhibit 19 is a list of the employees in his division, CHP. And I think there's about 63 employees on that list, which are vendor employees and personal service contract employees. He's listed as a vendor employee. And I think the testimony from his supervisor was that about 10 lost their jobs. Of how many? Of 63. So all of the people, if they're on the grid, if they're on that grid, that's Exhibit 19, that means they're going through the process of negotiating with the union on every single one of those people. So most of them did keep their jobs. Judge Schneier focused on the two because they were very similarly situated to Mr. Wynn. They had the same supervisor. They were in the same bureau. They had the same classification. And how many of those were there in total on the grid? People in his, they're similar, I guess. I'm trying to say they're similar, but in his exact position, there were three. There were three people. So himself. You mean Mr. Wynn? Yeah, Mr. Wynn, Kelly, and Mateo Cyan. So the two kept their jobs and he was. Right. The ones that worked under, when he insists, his supervisor in his very same position, two were kept and he was not. Were those other two positions union positions? The two employees were classified, the same union classification that the defendant is saying would have disqualified Mr. Wynn or required his contract to end at the end of 2010, PSA 6. So the other two were in the same position as Mr. Wynn. Yes. And only Mr. Wynn, of the three of them, was chosen to be not union. Exactly. Although Mr. Wynn's assistant went with him. Right. But you mentioned earlier there were like 60 people on the grid. 63, I think. Okay. How many of the 63 were in a similar situation employment-wise to Mr. Wynn and the other two? Just the three of the 63 or was it half? That's hard to tell. I wasn't able to tell that just from the grid and there wasn't testimony at the trial about that. There's plenty of people who are categorized PSA 6, but there's no evidence of what happened to them. So is it your contention that but for the discriminatory or adverse or the retaliatory nature of what happened to Mr. Wynn, the other two should have been gone also? I wouldn't say that they were. They should have also been gone. No, no. I'm saying that the other two were in the same position as Mr. Wynn. Right. And if Mr. Blair's testimony was credible, all three of them would have been terminated. Correct. But only Mr. Wynn was. Exactly. And only Mr. Wynn because he blew the whistle. Presumably. Okay. That's your position. Right. And that's what Judge Snyder found based on the evidence. I'd like to go back to the argument that retaliatory action and how it's defined in the act does not include non-renewal. Those words don't appear there. So, you know, one question is, is a discharge and a non-renewal the same? And it seems to me that there's a difference there to discharge somebody or not renew their contract. So you're relying most, although you relied on both, that and change in terms and conditions. The judge relied on change in terms and conditions. But if you don't renew, there are no change in terms and conditions. I mean, there is a difference, isn't there, between a contract that has terms and conditions and just not renewing a contract. That's not, there's no terms and conditions with regard to not renewing because there is no contract. Well, Mr. Wynn's contract had been renewed 13 times, so as part of a general event. But he also knew that at any time, and he acknowledged, at any time they could have stopped renewing it. So. Right. But the premise of that argument is that in order to be protected by the Ethics Act, you need an entitlement to continued employment. And nobody that the Ethics Act is trying to protect, there's no requirement of an entitlement. So an at-will employee from day to day does not have an expectation or a right to come back to work. But what he has is the right not to be told not to come back to work for retaliatory reasons. But based upon, well, I can understand if it was discharge in the middle of a contract. But what you're asking us to do, in order for us to affirm, we have to agree, don't we, on the fact that change in terms and condition of employment is analogous to a non-renewal? First of all, the Act does include contract employees. So they wanted, the legislature wanted to include them. And so then we have to find where is this noun renewal in this definition of retaliatory? It fits comfortably in both. There's nothing about discharge, the word discharge, that precludes a non-renewal from counting, if you literally construe that word as you must, for a remedial statute like the Ethics Act. So if you look up discharge in the dictionary, it says terminate, and Mr. Wynn testified that his contract was terminated, I mean, his employment was terminated. There's nothing strange about thinking about it that way. It doesn't require, you know, any mental backflip or stretching of the word. But it's definitely a change in terms and conditions because this all took place while he was an employee. With all of this retaliation, he was an employee. He had the right to be treated in a neutral manner, irrespective of his protected conduct, and he wasn't. And I wanted to point to, the defendant says, well, change in terms and conditions has to be something short of termination. So, and admits that these federal cases are instructive on this point. Cites to Cheyenne versus University of California, Davis, where the court found a change in terms and conditions where the plaintiff was forced to move his research lab. The court says in that case, use of the phrase change in terms and conditions of employment in an employment statute, quote, evinces legislative intent to strike at the entire spectrum of disparate treatment. In other words, the court there is recognizing that a lot of employee protective statutes have a list of things, and then they say, or change in the terms and conditions of employment. And what they're trying to do there is say. It's a catch-all. Exactly. So Cheyenne also notes that a retaliation claim can be based on any action reasonably likely to deter employees from engaging in protected activity. Certainly dismiss that test, right? If somebody knows that their contract isn't going to be renewed, then if they engage in protected conduct, they might very well keep their mouth shut and be deterred. And that would thwart the purpose of the Ethics Act, which wants to encourage people to report violations of law. DHS also relies on Crady, and that says, Crady versus Liberty National Bank and Trust, and that says a materially adverse change in terms and conditions can be, quote, indicated by a termination of employment, among other things. So ending someone's employment is not incompatible with that phrase. Are you making the argument that this non-renewable contact track was a pretext for their removing Mr. Wynn from his position? Yes, Your Honor. It was a pretext. But the fledgling process was ongoing. They didn't concoct the process for the purpose of finding a way to get rid of Mr. Wynn. He was part of the process, but it was a convenient pretext to say, oh, we can just tell him that the union is requiring his contract not to be renewed, when really I'm the one who's saying to the labor negotiator, don't worry about this one. Don't bother negotiating this one. I don't care. And the labor negotiator said, if a liaison said that to me, I'm not going to second guess. I'm not going to ask any questions. I'll just, that's another one off my list that I don't have to bargain over. What about the question, the motion that we took under advisement? What's your response as to why we should? Your Honor, I appreciate the defendant's position that the defendant is permitted to cite an additional statute or cite additional authority in support of its position. But I think this crossed the line into making a new argument. And it wasn't just responding to the argument, but this was a whole new field saying there is an inference to be drawn from the fact that the court, I mean that the legislature in drafting these two other statutes years apart, used this language in one and this language in another. That was a separate argument, a new argument. Had that been drawn up alone? In the trial court? Yeah. I don't believe so. I can't swear to that, but I don't think so. And, Your Honor, there isn't an inference to be drawn from that. I mean, the U.S. Supreme Court has said, has made clear that the legislature doesn't always use the precisely same language, the precise same language in every statute. And it might implicitly include an action in one and explicitly include it in another. And if you look at the Human Rights Act and the Ethics Act side by side, they both list different specific things. But if you look at the case law that interprets the Human Rights Act, you see that courts routinely find actions that are explicitly listed in the Ethics Act to fall under the terms and conditions of employment in the Human Rights Act. The court adopts that broad reading of the phrase. I think in the Human Rights Act it's actually terms, privileges, and conditions. But it reads that phrase to mean any materially adverse employment action. That's what they're getting at there. Thank you very much. Thank you very much. Your Honors, the Department did argue in the trial court that failure to renew a fixed-term contract is not a discharge. It did so on page C85 of the record. And it continued to press that point during argument in R30, colon 103, 162, colon 478, C1248-49, constantly saying there's no expectation of renewal. This is not a discharge. But you would agree that the Department had the discretion on whether to renew the contract. It did not. There are two things in play here, Your Honor. There's your job title. There's your PSA 6 title. And there's your scope of duties. They had to look at both things. And Mr. Wynn's scope of duties, as well as his classification, was union. They did not have the discretion. Well, how did they have the discretion for the other two that were similarly situated? They were vendors. And vendors were vendors. No, the reason, he was a contractor until they couldn't do contracts anymore. And then they placed him at the vendor to be able to allow him. But the vendor contract evaporated. It expired in June of 2010. There was no more place to shelter him that way. They couldn't just go out and find some vendor and force them to hire him so he could continue to do work for the Department. And they couldn't give him a new contract. The vendor contract ended in 2010. He was PSA. He was a PSC right up until 2009. And for the specialized exceptions required, he would have had to have been a medical doctor or an IT person capable of designing systems. Coons didn't say he could have made an argument on behalf of Mr. Wynn under that specialized exception. He said, I've never seen that done for a program administrator. That would have been an extremely hard sell. The standard was not, oh, we like you. We value you. We want to keep you. It was, do you have a license for some specialized skills that nobody else has so that you're not, you know, the union has to let us, you know, we can negotiate this on your behalf. They had a lot of other, there were like 800 to 900 names on that list when it started out because they had to put everybody on it, vendors, contractors, short-term people. Those two women who came up during the trial, Gray and Sparks, they were on the grid but they had short-term contracts and those were not applicable. Those were okay. Those passed. Explain this to me. If DHS was so certain about what was supposed to happen to each employee, why is it that they needed a liaison? Why wouldn't you just tell them the job titles and the duties and let them do what they had to do? Why didn't it occur like that? That was, okay, there were two things going on. There was Mr. Coons, the labor person, who was having discussions with the union, presenting, you know, documentation and coming to an agreement with them. It was really more a discussion, he said, than a negotiation. But there was an internal process as well, and Blair and his assistant, Deb, were liaisons to that internal process. And the point of that was to try to find out, okay, what jobs can we afford to lose just entirely because we're forced to, and there were a lot of those. So there was some discretion in this process. It was not discretion in whom to let go, Your Honor. But you said, what jobs can we afford to lose? Without converting them to state positions. See, there were three things going on. There were either the vendors, the short-term contractors that you could keep because it didn't violate the collective bargaining agreement, and then there were the jobs that you didn't have the funding for. You couldn't justify it. It's not in the budget. See, the beauty of contract employers is they save money. You don't have to pay them benefits. Their funding sources tend to be grants and outside things. Once you're told you can't have those people anymore, now you've got a really, really painful process of triage. You have to figure out, okay, what can we absolutely not do without? And those we have to figure out if we have the money to fund them and convert them to state positions. And that's what happened here. And, you know, the fact that somebody's renewal, Your Honor, is, you know, the fact that a contract process renews. Well, by converting them to state positions, isn't it more expensive then? Yes. Right. So isn't it to the department's advantage to keep the contract employers? If they can. If they can. They wanted to keep them. This was not anybody's idea of a good time. They wanted, they liked them, they wanted to keep them. They did not see a path to do that. And it was like that with hundreds and hundreds of other people. This was an awful process, Your Honor. I mean, I'm told the Department of Rehabilitation Services had something like 100 contractors. I don't know how many they have left. But this was an awful process. Nobody enjoyed it. If the Court has no further questions for all the reasons stated in our opening brief and our reply in here today, we urge the Court to reverse the Circuit Court's judgment. Thank you. We will take the case under advisement. I wanted to thank both sides. Both of you did an excellent job. And your briefs were very well done. Gave us a lot to think about. And this is an issue that hasn't been reviewed, which is why we wanted to hear from both of you. And we thank you very much.